Ms. Eliades. May it please the court. My name is Rosa Eliades and I represent Mr. Siamak Safavi Fard and I will refer to him as Mr. Fard for purposes of the argument. The main errors on appeal that we have alleged involve two very specific violations of Rule 11's mandate and that involves the fact that the court must go over and determine with the defendant who is pleading whether or not the plea is voluntary, mainly whether the plea is entered voluntarily and not the result of any promises, coercion, or any other threats. The other element that's missing from the Rule 11's mandate deals with whether or not the court explained the nature of the offense. And by way of background I will, I do think it's important to tell the story by introducing the facts to the court. This was an individual's charge in 2009. Trial was set from November of 2010 and continued three times. On April 4th in 2011 his attorney, who was retained, filed a motion to proceed CJA and the court denied the motion and granted one more continuance. Some motions were filed. There were three parties that remained. Mr. Wood counsel as well as filing his own motions. And at the final pretrial conference the date for trial was reset once again to October 18th. Now on October 12th was the first meeting between the government's counsel, appellant's counsel, and the agents to discuss any cooperation. This was just one day prior to the October 13th date wherein Mr. Fard entered into the courtroom and entered his plea of guilty. What's important about this plea colloquy is that there were three separate breaks that took place. Three separate breaks where counsel was asked to confer with his client on what should be done in this case. That's unusual. The first break was proceeded by counsel's request for a continuance of 90 days before anything was done on the case. A case that had been pending for well over two and a half years now. So here's how these colloquies, and you're right, they break down into a couple of parts, strike me. There comes a point with the early one where the judge says, look I don't have a guilty plea here. I'm not trying to force you to plead guilty. Let's just go to trial. And there's further activity after that. I would say if that's all that had happened and he had nonetheless pushed a guilty plea on Mr. Fard, then it would have been an abuse of discretion not to permit a change of plea. But later the judge tries to break it down and he asks much more particular questions of Mr. Fard. It's where Mr. Fard starts saying, I participated. I knew probably their stuff wasn't kosher, he wasn't kosher. And then there are more particular questions. So I'm going to agree with you to the extent that this is by far from the greatest colloquy I've ever seen. It may be one of the worst, but it looks to me like he does finally nail down the key facts that he needs to have. And Mr. Fard does confirm that he's pleading guilty, that he wants to plead guilty. The judge goes through the procedural sacrifices that are made. So are you actually saying that there's no factual basis for the plea? No, Your Honor. Or is it your point that he doesn't understand the charges? Or something else? Well, there's two violations. One of them is that the court didn't inquire whether there were any promises made to this defendant that are outside the record. That's one specific allegation. And that was the basis for the motion to withdraw his plea. But then he has a hearing on that, and he makes a credibility determination that he believes the lawyer, not Mr. Fard, about whether there were any such promises. Right. And that is what's reflected in the records, but the court can look at the actual dialogue, the actual testimony in the hearing, and determine that really the only main differences are whether or not Mr. Fard was promised that this case would be dismissed. But the thing is, the judge makes a finding about that. So even if there was a flaw in the hearing, he looks into it and decides that there were no promises. And the problem we have with it is the manner, his decision when he did look into it, Your Honor. I think if you bear the testimony and take the testimony and compare to the entire record, we can see that at the end of the day, clearly Mr. Fard was, he pled guilty on an expectation that his case would be dismissed. And the lawyer even admits on the record, granted tongue-in-cheek, he had this conversations on a very serious case, in a very serious manner, that his case would be dismissed. But that requires us to believe Mr. Fard. I mean, whatever Mr. Fard had inside his own brain is something different from what Mr. Amiranti said to him. Not necessarily, Your Honor, because he does admit that he did say that to him. In light of the district court's findings, though, you're telling us that we have to disregard the district court's findings on this point. There's two ways, Your Honor. We can find clear error, or we can find that simply under these circumstances, it wasn't enough. Because the record itself supports a voluntary, in light of the fact that Mr. Fard was told about a dismissal, was never clarified that that was not an option. But the telling about the dismissal was in a different context, though, wasn't it? Didn't he say something, well, maybe if you go work undercover and go to Iran or something like that? Well, that's when he refers to it as a tongue-in-cheek conversation. But actually, on the record, prior to his plea, he tells the court that this is historical cooperation, progressive moving forward, which means he's probably going to inform as he's going. So that's discussed just minutes prior to this plea is taken. So that's not like happening in his office only months prior to this plea. It's actually taking place that morning, in front of the court, and the court's well aware that this is one of the reasons that this defendant is asking for a continuance. His attorney says, and there's no dispute by the government, the government agrees. We're going to have historical cooperation. So that leaves the defendant standing there thinking, okay, this is exactly what we agreed to. It's not like in a vacuum where this conversation about the case being dismissed, he, the actual attorney, Mr. Amarante, tells the court, we may not need to come back and plea this case. So there's a big difference in this conversation maybe happening someday in determining whether that's a credible statement, and actually seeing it take place in front of the court where the judge knows that this defendant has been told his case might be dismissed because the actual attorney is telling that to the court at that point in time. And yet we still have this plea, and he's never asked whether or not there's any promises that he's relying on. And he's never, this point's never clarified. By the way, that dismissal, that's never going to happen. That's not in the record either. There's a lot of steps and a lot of precautions the court could have taken knowing that this defendant is harboring under the impression from his attorney that his case may go away. And of course his counsel was right there and didn't say anything about that, the promises? No, he did not. Not on the record. And do you think he had any obligation to say anything if something like that, that critical, as you say, was part of the agreement? It's hard to say. Or counsel could have just said to the government, and what about what you've promised? You want to put that on the record, Mr. Prosecutor? I don't know. I can't speak for what should have been done because I don't know exactly, you know, none of us know what was the conversation that preceded the plea colloquy. If that was me, I can tell you what I would have done, but I can't say that... Which would have been to bring it to the attention of the court, right, and to put it on the record. Yes, because the whole point of having a very detailed Rule 11 colloquy, I believe, is to make a clear record. It's supposed to protect the attorney. It's supposed to protect all the parties. And the case law is very clear. We don't want to have to look at this in hindsight and then say what happened. We want to know right then and there, and I've been in many long pleas where the court is being very conscientious in covering all these grounds. So that's one of the factors that's very important. I know my time is up. Why don't you finish up your thought, and I'll give you a minute in rebuttal. Thank you, Your Honor. The point is the question, the strict mandate of Rule 11, whether or not any promises were ever made was never asked. And this is probably the clearest example of when we need to follow this rule's mandate and the harm that can flow from it. The other issue does deal with whether or not the client understood the nature of the offense. And briefly, the problem with that is this is a specific intent crime, and you have an individual and his attorney telling the court that he believes his intentions were honest and businesslike. So if they actually went through the elements of the offense, that plea would not have gone through. And the elements of the offense were never outlined for this defendant to understand. Thank you. Thank you very much, Ms. Eliades. Mr. McFadden. Excuse me. Good morning, Your Honor. May it please the court. Christopher McFadden on behalf of the United States. There were no promises put on the record because there were no promises. What's clear from the record was, as defense counsel said at the outset, there had been some discussions about the defendant potentially cooperating, but there were no promises. He may have had some hopes that things would work out, and he was given a chance after his plea to let those hopes blossom into something more. But Mr. McFadden, this was a very messy proceeding. I mean, maybe it's salvageable, maybe it isn't. We'll see. But at first, I think the district court was entirely right to say, I don't think I'm hearing enough to accept this plea. I'm paraphrasing, but he says something to that effect, and he makes it clear, I'm perfectly happy to go to trial on this. We have a date, whatever it was, three weeks out, and I'm not forcing anybody to plead guilty, and I'm certain an experienced judge like Judge Grady would never have dreamed of forcing anybody to plead guilty. And then there are these breaks, and we go back, and we have this incredible ambiguity. Even up to, well, it wasn't kosher. That's so casual. It's just not a very satisfactory statement of what the factual basis is. I think the specific intent is interesting. I'm a little worried with the lawyer saying, well, maybe I said something in jest. How do we know what the client heard? Let me try to take those in order, and I'll start with the factual basis and whether the defendant understood that there needed to be fraudulent intent, Judge. Up to about page 24 of our appendix, which is 24 of the plea colloquy, there hadn't been enough to establish fraudulent intent. At that point, the judge says, look, if there's going to be a plea, he has to admit that he participated in a scheme knowing it was a fraudulent scheme. That's at page 24. And then the judge says, let's take a break. If he wants to plead, fine. If he doesn't, we'll go to trial in three weeks. After the break, defense counsel says, my client knew that the people who were applying for this mortgage were doing so under false pretenses. But that's the lawyer saying it. It's not Mr. Fard saying it. I didn't mean to interrupt, Judge. Right after that, Judge Grady says, well, I want to ask Mr. Fard, what is he pleading guilty to? Mr. Fard says that he knew the stuff wasn't kosher, which he then clarifies to mean he knew that the nominees were saying that they were going to live in the properties when they didn't intend to. And then there's a direct question and answer where Judge Grady says something to the effect of you knew they would not have qualified for the loans if they had told the truth about themselves. The defendant says yes. The defendant then says that he knew that in the loan applications people were saying they were going to use the money for one purpose, namely for count three of the property on Oakley Avenue, but in fact they were using the money for other purposes. That's fraud and that's fraudulent intent, Judge. They would not have got the loans if they had told the truth about themselves. So they lied and they got the loans. And it worked out great for the defendant because even though he's buying these houses through nominees, he admitted to Judge Grady that he knew if something went wrong with this loan, which it did, that he would not be responsible. And then just to top that off, Judge Grady then asks about the interstate wire element. And this is on, I believe, page 30 of the appendix and page 30 of the record. Before that, the judge says I need to have a dental license and then another break, another break. Break after break after break. And the lawyer says, on behalf of his client at some point, everything he did was very businesslike and upstanding, something like that. There was that comment about businesslike, which the defendant said, and then the judge later interprets, like what I heard you saying is when you're saying that you were acting businesslike, you meant that you were going to repay the loans because you hoped everything would work out and there would be a profit. But, Judge, that's the case in almost every fraud case. These guys, if only the economy hadn't collapsed, if only the mortgage boom wouldn't have gone away, I would have paid back the loans. That's not a defense. Yeah, but usually in a plea colloquy, there's something more direct, like I knew what I was doing. I knew this was a fraud. I knew this was wrong. I mean, that's why the judge felt like he needed to be a dentist. And it's vague here. Well, some parts may be vague, but I think it's pretty clear when the defendant is saying that he knew these people would not have qualified for loans if they told the truth about themselves and he knew that the paperwork contained inaccuracies. So he knows that in these applications there are lies being submitted in order to obtain money, in order to obtain those loans. I guess the difficulty that I have is that the whole day starts out with the statement by a counsel that if we just put this off for something like 90 days, this may go away. There may be no need for a plea whatsoever. So that's sort of the starting premise here. And then everything else after this, with all this confusion, what is Mr. Fard to think, whether he's really pleading guilty or not, or is he just deferring this? Judge, that's very difficult for me. Let me go into that a second. There was the evidentiary hearing in this court, and we've cited cases. There doesn't always need to be literal compliance with all the provisions of Rule 11, and often that is taken care of in an evidentiary hearing where questions are resolved. In this evidentiary hearing, you had the defendant say, you know, I pled guilty because I believed even if I pled to count three it was going to go away someday. The district judge found that testimony was not credible. He said it was simply an untruthful allegation by the defendant. Well, you knew at the time that the plea was, that day of the plea, there had been discussions about his cooperation, true? There had been some discussions. Right, and none of those had come to fruition. Correct. And so sort of knowing that that had been a struggle in this case, the government never put it on the record either when there was that dialogue on the fact that it was a blind plea, right? Right, and the government didn't say, and, you know, we just want to be clear here, there have been no promises made. Nobody from the government said that either, right? Judge, it was never said that anything was going to happen. It was said that there would be some meetings and that he would be given an opportunity to do what he could later on. And is that on the record? That is not on the record, though. Not at the plea colloquy, but by the time of the evidentiary hearing. There were questions along those lines. Exactly, but what I'm saying is a plea colloquy, when you're just in the midst of something like that, it's really helpful, I think, at the plea colloquy to say we don't have an agreement. There's no agreement for cooperation. It is a blind plea. There have been some conversations, but there is no agreement on behalf of the government about what is to happen. I mean, you agree that would have clarified the record. Something with those verbatim, there would be no question we wouldn't even be here. But I would like to point out it was said several times by the prosecutors this was a blind plea. There were no promises in any direction, and that was why there were a lot of open issues for sentencing. Well, you say that in conjunction with sentencing. I think it's you, Ms. Endless. There's another Mr. McFadden around. That's me. On page 31, line 10, in terms of the guideline calculations, Judge, since this is a blind plea with no agreements. So it's just that this is in the context of sentencing as opposed to cooperation or any of the other topics it might be. But I think that you can draw the inference from this, Judge. Everybody is saying this is something. Well, no, your first sentence, as Judge Wood points out, that introduces it, it says, in terms of guideline calculations, Judge, since this is a blind plea with no agreements. I don't know if I'm in a position right now to say what the guidelines could possibly be. So it is in the context of the guidelines. It's not in the context of the whole cooperation business. On page 9 of the record, which is government's appendix, page 9, this is at the very beginning of the colloquy. The court asked if Mr. Farr is going to plead guilty to count three. I then said, that's correct, Judge. This is a blind plea with no promises in either direction. So, I mean, at the very beginning, we said it's a blind plea with no promises in either direction. Defense counsel said that Mr. Amiranti told his client, oh, yeah, everything is going to go away. That's not an accurate summary of the record. The accurate summary of the record is this. As Judge Kinder got to with his questions, this is page 62 of the appendix. What defense counsel said, tongue-in-cheek, was this. Maybe, you know, Mr. Farr, this is the perfect time. The problems you're having in the Middle East with Iran, you have dual citizenship as an Iranian and American. Maybe you go undercover for the government, go to Iran, be a spy, really work for the government, put your money where your mouth is. If you do that, maybe you can even convince the government to dismiss the entire case against you. And he says this was tongue-in-cheek. We were talking back and forth in the office. As far as promising anything or telling him the case would be dismissed, never. So, at best, because it's on page 92 and 93 of the appendix, the only basis for the defendant saying that there was some promise is what he's saying as the defense lawyer told him. And all the defense lawyer ever told him was, maybe if you go over to the Mideast, you work for a couple years undercover, maybe we can talk then about dismissing the case. But it was never said, yeah, if you plead to count three, this is all a formality. The government's just going to dump this case. It can all go away. I think the backup argument that they've made is that maybe the defendant had a subjective but mistaken belief that there was this type of plea. But the problem with that argument, it runs against the credibility findings made by the district judge. And I know it's really difficult to go behind a credibility finding, but there's not a lot of detail in this finding. Judge Grady assesses the defense counsel and basically says, he just isn't the kind of lawyer that would keep something from the court if there was this side deal. But there are these deals. These deals do happen sometimes. It sounds very rare, I'm sure, but there are times when cases go away. When a defendant does something extraordinary, a case goes away. And relying on the professionalism or the reputation of defense counsel might be a problem in some cases. But in this case, from the evidentiary hearing, you have the defendant himself saying, I believe my lawyer was acting in my best interest because of his reputation, because he was a former Marine, because he was a former prosecutor. So the reason that the defendant is giving for saying that he was relying on the attorney is the reason that the judge is then using to say, this is why I'm believing the attorney is credible and not you. It's not something that was just imported from outer space. It was something that was actually being discussed on the record, and he relied on that. In addition, the judge did find that there was no possibility that a promise like this would have been made by the government. And there was testimony from the FBI agent that there were no promises like this, that the defendant was given a chance to come in and cooperate, and that very early on he no longer wanted to discuss anything about himself. He made statements that the agents believed were untruthful. And so after having been given that opportunity to cooperate, it was not going anywhere, and the defendant didn't set up any meetings after that. Unless you have any questions on the enhancements, I think that's been covered by what I've said already. Your Honor, the standard review here is clearly erroneous. There were credibility findings made by the district judge. Plea colloquies are a little bit like contracts. They can always be a little bit better, but that is not in itself a reason to vacate and to reverse this case. We ask that it be affirmed. All right, thank you very much. We'll give Ms. Eliade's three minutes because we went over a bit, if you want them. You're always free to use less time. Thank you, Your Honor. I do want to make a few points to clarify for the record. One of the issues is that it wasn't a straight, I don't know how to describe it, but the fact that there were misrepresentations on this paperwork that constituted the fraud does not mean that he intended to defraud. And that problem is seen clearly in the plea colloquy where he says that the paperwork didn't match our verbal agreements. So he's telling the court, here's the deal. I was at this closing, and the lenders who are the parties to the, you know, who are the people who are telling me how to make this deal work are telling me that this is fine. This is how we do it. We suggested to him, he's telling the court, and his attorney also says, they're the ones who suggested how to do this. So there's where the intent to defraud is critical in this case. Not only did, I think it's worldwide, the lender, but also he said he talked to some actual attorney, and they're the ones who said, this is the way you do it. So I don't think that the factual basis as it stands is sufficient in the context of the entire record. There's clearly issues where he's saying, I feel my client was businesslike, and he supported in the facts, and that's why the plea was so strenuous, because he kept interrupting the judge and saying, no, that's not what I understood was happening. But judge, they understood, the lenders, the people that were party to this knew that I was, they're the ones who came up with it. So it's not that clear cut of a factual basis to support it under these circumstances, and that's where we go back to why it's necessary to have specific intent to defraud. Participation is not enough. Knowledge is not enough. There's got to be deceit that is intended, and that cannot be truthful. That cannot be found when the parties that are actually participating in the transaction know what's going on. So the papers don't match the party's agreement. So you're saying that the bank essentially, or the lender, was in collusion with him? Well, yes, and not only that, that came up in the pretrial motions. Attorney Durkin was arguing that, and it, for the first time, became clear during the plea, as to why he's making these arguments. The pretrial motions are dealing with the fact of how much can they prove this collusion. So it's not a clear cut case. The mere facts that were recited in the actual factual basis are not sufficient in this case, and the court knew all this. In reviewing the record, it's all in there at the time and place where the court was making its decision to accept this plea. In addition, regardless of these conversations that were tongue-in-cheek and the absurdity of becoming a spy, we can't get around the fact that that morning a possible dismissal was still discussed, and that leads anyone to believe that that attorney was still making those representations to his client up until the morning of the plea. Okay. I think your time is up. Thank you, Your Honor. And we thank you very much, and you were appointed, were you not? Yes, Your Honor. We appreciate very much your help to the court and to your client. And thanks as well to the government. We'll take this case under advisement, and the court will be in recess.